IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 14, 2020 Session

**BELINDA BENTLEY WRIGHT v. JOHN ANDREW WRIGHT**

**Appeal from the Circuit Court for Shelby County
No. CT-004322-14 Gina C. Higgins, Judge**

_____

**No. W2018-02163-COA-R3-CV**
_____

This is a divorce case. Appellant Husband appeals the trial court's: (1) classification of certain property; (2) imputation of income for purposes of child support; (3) denial of the parties' proposed parenting plan; and (4) award of rehabilitative, transitional, and alimony in solido to Appellee Wife. We conclude that the trial court erred in: (1) the classification of certain marital property; (2) the amount of income imputed to the parties'; (3) denying the parties' proposed parenting plan absent sufficient findings; (4) its award of rehabilitative alimony; and (5) in the amount of transitional alimony awarded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed in Part, Vacated in Part, Affirmed in Part as Modified, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, and ARNOLD B. GOLDIN, JJ., joined.

Stuart B. Breakstone and Adrian Vivar-Alcalde, Memphis, Tennessee, for the appellant, John Andrew Wright.

Charles W. McGhee and Leah Lloyd Hillis, Memphis, Tennessee, for the appellee, Belinda Bentley Wright.

**OPINION**

**I. Background**

Appellant John Andrew Wright ("Husband") and Appellee Belinda Bentley Wright ("Wife") were married on December 23, 2005 in Salt Lake City, Utah. This was

Wife's second marriage and Husband's first marriage. One child, Joshua, was born to the marriage (Wife has an adult daughter from her previous marriage). At the time of the divorce hearing, Joshua was 9 years old. The parties, who are Mormon, first lived in Wheaton, Illinois. They moved to Shelby County in February 2009.

Wife has both a J.D. and an L.L.M. from John Marshall University. In 2009, she became licensed to practice law in Tennessee and has remained in good standing since that time. Although Wife is a licensed attorney in Tennessee, she has never practiced. Since the parties' marriage, Wife's only employment has been as an adjunct professor at the University of Memphis during the Spring 2012 semester; she earned approximately $4,000 that semester.

Husband holds a Bachelor of Science degree in chemical engineering from Brigham Young University and a Master of Business Administration degree from Stanford University. During the marriage, Husband worked for United Airlines in Chicago from 2001 to 2006. From 2007 to 2014, he worked for AutoZone in Memphis. Husband received a base salary plus bonuses and was eligible to receive stock options each year he worked for AutoZone. Not including stock options, Husband's average salary for the last three years he worked for AutoZone (i.e., 2012-2014) was $208,714. Approximately one month after the parties separated, in May of 2015, Husband accepted AutoZone's offer of a buy-out; the question of whether Husband was forced to take the buy-out or whether he voluntarily did so is disputed in the record. He remained unemployed until the Fall of 2015 when he began work as a consultant for Epsilon Loyalty Agency. At Epsilon, Husband earned $140 per hour. His 2016 W-2 reflects income of $126,800, and his 2017 W-2 reflects income of $63,035. Husband testified that his hours at Epsilon had declined due to factors outside his control.

Approximately ten years prior to the marriage, Husband purchased a home at 7360 Mimosa Lane in Dallas, Texas (the "Texas Property"). At the time of the hearing, Husband estimated that the Texas Property was valued at $500,000 and was encumbered with a mortgage of approximately $370,000; he further stipulated that at least $100,000 in marital funds had been used to maintain the Texas Property and to pay the mortgage. Wife asserted that significantly more martial funds were used to maintain the Texas Property, thus transmuting it into marital property.

At the time of the marriage, Husband also owned a 401(k) plan with United Airlines, which had a balance of approximately $46,986. At the time of the marriage, Husband also owned an IRA with Ameritrade, which had a balance of approximately $5,904. As discussed below, in October 2007, Husband rolled the entirety of the United 401(k) into a Fidelity IRA. At the time of the rollover, the United 401(k) had a balance of approximately $119,352.27. No other funds were added to the Fidelity account. The Fidelity IRA decreased in value due solely to fluctuations in the market, and by May of 2009, the account balance had dropped to approximately $44,069.00. Husband then

rolled the Fidelity IRA into the existing Ameritrade IRA.

Wife filed her complaint for divorce on October 14, 2014. Husband filed an answer and counter-complaint on November 3, 2014. On August 17, 2015, the trial court entered a temporary parenting plan for the minor child. The temporary plan gave the parties equal parenting time and joint decision making. Prior to trial, the parties advised the court that they had agreed on a permanent parenting plan that contemplated equal parenting time. The parties announced that the only issues to be decided regarding parenting were child support, designation of the primary residential parent, and which party would be entitled to the tax credit.

The hearing on the divorce began on March 28, 2018 and concluded on April 9, 2018. The trial court entered its final decree of divorce on November 7, 2018; the trial court's relevant findings and conclusions are discussed below. Husband appeals.

## II. Issues

Husband raises the following issues for review:

1. The trial court erred in its classification of certain marital assets and liabilities.
2. The trial court erred in its imputation of income for the parties and finding Husband is willfully underemployed.
3. The trial court erred in not adopting the parties' proposed [parenting plan] and adopted a permanent parenting plan that is not in the best interest of the child.
4. The trial court erred in awarding Wife alimony *in solido* for payment of attorney's fees and three years of transitional alimony.

In the posture of Appellee, Wife raises the following additional issues:

1. Did the trial court err by finding that the property in Texas had both marital and separate interest.
2. Did the trial court err by finding that 51% of the AmeriTrade IRA was Husband's separate property.
3. Should Husband be required to pay Wife's attorney fees and suit expenses on appeal.

## III. Standard of Review

"We review a non-jury case de novo upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise." *Tennessee Farmers Mut. Ins. Co. v. Debruce*, No. E2017-02078-COA-R3-CV, 2018 WL 3773912, at *3 (Tenn. Ct. App. Aug. 9, 2018) (citing Tenn. R. App. P.

13(d); ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000)). The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." ***Brunswick Acceptance Co., LLC v. MEJ, LLC***, 292 S.W.3d 638, 642 (Tenn. 2008).

## IV. Classification of Property

Tennessee Code Annotated section 36-4-121 defines marital property and separate property, in relevant part, as follows:

> (b) For purposes of this chapter
>
> (1)(A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . . All marital property shall be valued as of a date as near as possible to the date of entry of the order finally dividing the marital property;
>
> (B)(i) "Marital property" includes income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation;
> (ii) "Marital property" includes the value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefit rights accrued as a result of employment during the marriage;
> (iii) The account balance, accrued benefit, or other value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefits accrued as a result of employment prior to the marriage, together with the appreciation of the value, shall be "separate property."
>
> ***
>
> (D) As used in this subsection (b), "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine;
>
> ***
>
> (2) "Separate property" means:
>
> (A) All real and personal property owned by a spouse before marriage,

- 4 -

including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 (26 U.S.C.),1 as amended;

***

(C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);

In addition to the provisions of Tennessee Code Annotated section 36-4-121, Tennessee courts have recognized two methods by which separate property may be converted into marital property, i.e., commingling and transmutation.

> [S]eparate property becomes marital property [by commingling] if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur.... [Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. . . . The rationale underlying these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed to be marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002) (brackets and ellipses in original) (citations omitted).

Concerning our review of the trial court's classification of property in a divorce,

> "[q]uestions regarding the classification of property as either marital or separate, as opposed to questions involving the appropriateness of the division of the marital estate, are inherently factual." *Owens v. Owens*, 241 S.W.3d 478, 485 (Tenn. Ct. App. 2007) (citations omitted). As such, we employ the familiar standard of review outlined in Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005). "As a general rule, assets acquired by either spouse during the marriage are presumed to be marital property." *Owens*, 241 S.W.3d at 485 (citations omitted). Moreover, when a spouse

- 5 -

seeks to assert that an asset acquired during the marriage is separate property, he or she bears the burden of proving that fact by a preponderance of the evidence. *Id.* at 485-86 (citations omitted).

*Bewick v. Bewick*, No. M2015-02009-COA-R3-CV, 2017 WL 568544, at *7 (Tenn. Ct. App. Feb. 13, 2017).

Here, the parties dispute the trial court's classification of two assets, i.e., the Ameritrade IRA and the Texas Property. With the foregoing law in mind, we turn to address the parties' respective arguments.

### A. Ameritrade IRA

In the final decree of divorce, the trial court divided the Ameritrade IRA as follows:

> Ameritrade IRA, ending 0803. At the time of trial in this matter, the account balance was $355,767. The parties agreed that at least 41% of this balance was Husband's separate property, owned prior to the parties' marriage. What remained in dispute was what portion of the remaining 59% was marital or separate property. As such, the Court awards Husband the 41% of this balance, as it existed at the time of trial, as his separate property. The Court rounds this amount to $146,000. With regard to the remaining 59%, the Court finds that, in 2005, prior to the parties' marriage, the account had a balance of $46,986.42 and by the end of 2006, the account had a balance of $128,204.23. Then, in 2008, the account had a value of $146,127.27. These changes in value were due to contributions as well as market pressures.
> The Court finds that between 2005 and 2006, the monies that went into the account, up to $128,204, were Husband's separate property and that this amount appears to be the 41% that the parties agree is Husband's separate property. The Court then also finds that it would be equitable to award Husband an additional $50,000 from this account as his separate property, taking his share of the account value at the time of trial to $196,000.
> As such, the remaining balance in this account, $159,767, <u>as of the time of trial</u>, is marital property and shall be divided as follows:
> i. The Court further increases the award of $196,000 to Husband by an additional $15,000 from the marital portion of this account to offset the award to Wife of 100% of the Epsilon 401k . . . .
> ii. Wife shall be awarded, from the marital portion of this account, $119,000 and Husband shall be awarded the remaining $25,767.

iii. The Court recognizes, however, that after the trial in this matter and prior to this Court's ruling, the parties entered into consent orders, allowing Husband to remove monies from this account in order to meet his ongoing monthly expenses as well as meet his *pendente lite* obligations to Wife. All told, Husband removed, by agreement, $42,821 from his separate portion of the IRA. As such, Husband's separate portion of $196,000 is reduced by $42,821 making Husband's separate portion $153,179.

iv. Therefore, Husband's total award from this account is his separate portion of $153,179, his offset of $15,000 due to Wife receiving the Epsilon 401k, and his award of the marital portion of $25,767 for a total of $193,946.

v. Once the removal of $42,821 from the IRA balance of $355,767 is taken into account, the total account balance is $312,946. Husband's toal award is $193,946 and Wife's total award is $119,000. Husband's award is 62% of this balance of $312,946 and Wife's award is 38% [sic] of this balance.

vi. All gains or losses on this account from the time of the last day of trial to the date of entry of the Final Decree of Divorce, solely due to market pressure, shall be born proportionally by each of the parties, Wife receiving 38% and Husband receiving 62%.

(Emphasis in original).

In **Snodgrass v. Snodgrass**, 295 S.W.3d 240 (Tenn. 2009), the Tennessee Supreme Court addressed the narrow issue of whether a party's 401(k) account was a "retirement or other fringe benefit right" related to employment. **Snodgrass**, 295 S.W.3d at 249. As set out in context above, under Tennessee Code Annotated section 36-4-121(b)(1)(B), marital property includes

income from, and any increase in the value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation; (ii) . . . the value of vested and unvested pension benefits, vested and unvested stock option rights, retirement, and other fringe benefit rights accrued as a result of employment during the marriage;

The **Snodgrass** Court explained that

Tennessee Code Annotated section 36-4-121(b)(1)(B) contains two independent definitions of marital property. The first clause refers to income from and appreciation on separate property that accrues during the marriage where "each party substantially contributed to [the separate property's] preservation and appreciation." Tenn. Code Ann. § 36-4-121(b)(1)(B). The second clause refers to "the value of vested and unvested pension, vested and unvested stock option rights, retirement or

other fringe benefit rights relating to employment that accrued during the period of the marriage." If the property at issue is deemed to fit within this second clause, then it is marital property without regard to "substantial contributions" by either spouse. *See Batson v. Batson*, 769 S.W.2d 849, 857 (Tenn. Ct. App. 1988) (recognizing that "[t]he pension provision is not modified by the 'substantial contribution' requirement preceding it" and that "pension benefits earned by a spouse during the marriage are marital property even though the other spouse did not contribute directly to their preservation or appreciation").

Once the property is determined to be a pension, stock option, retirement or other fringe benefit right relating to employment, the issue becomes one of determining the value of that benefit that accrued during the marriage. In *Umstot v. Umstot*, 968 S.W.2d 819 (Tenn. Ct. App. 1997), our Court of Appeals considered an argument similar to the one being made by Husband in this case. In *Umstot*, the husband had a "retirement plan" that held a balance of $4,437 at the time of marriage. The plan grew by $154,106 during the marriage. The husband argued that both the premarital balance and the growth attributable to that amount should have been deemed his separate property. The Court of Appeals disagreed, stating that "the critical determination is whether the value 'accrued' during the marriage." *Id*. at 822. The court held that "all of Husband's retirement plan, except $4,437.00, accrued during the marriage." *Id*. Accordingly, the entire balance of the husband's retirement plan was marital property except for the premarital balance of $4,437. *Id.*

We agree with this reasoning. If a contested piece of property fits within the second clause of (b)(1)(B), then the entire net increase in value of that property that accrues during the marriage, through whatever means or methods, is deemed marital, even if the property contains an element of separate property. *See Franklin v. Franklin*, C/A No. 03A01-9410-CV-00364, 1995 WL 371573, at *2 (Tenn. Ct. App. June 21, 1995) (holding that "everything in Husband's thrift and profit sharing plan, save the $5,091 in there at the time of the marriage, 'accrued' after the marriage" and was therefore marital property because "[t]his code section does not differentiate between value added by 'passive income' and value added by additional contributions during the marriage"); *see also McKee v. McKee*, No. M1997-00204-COA-R3-CV, 2000 WL 666363, at *3 (Tenn. Ct. App. May 23, 2000) (recognizing that "marital property includes any increase during the marriage in the value of retirement or pension rights, whether through passive growth or through either party's direct or indirect contribution").

If, however, the property at issue does not fit within this second clause and is otherwise deemed to be separate, any income from or appreciation of the property will remain separate unless a court finds

sufficient evidence to support a theory of substantial contribution, commingling, transmutation, gift to the marital estate, or some other theory by which otherwise separate property may be deemed marital.

*Snodgrass*, 295 S.W.3d at 247-49 (citations and footnote omitted).

Concerning the distinction between a 401(k) account and an IRA, the **Snodgrass** Court, noted that

individuals may participate in a 401(k) plan only through their employment. See 26 U.S.C.A. § 401 (West 2002). A 401(k) account is therefore distinct from an Individual Retirement Account ("IRA"), a tax-deferred and age-sensitive savings vehicle available to individuals outside of their employment. See generally 26 U.S.C.A. § 408 (West 2002). Additionally, an employee may possess only one 401(k) account per employer.

*Snodgrass*, 295 S.W.3d at 250 (footnote omitted).  Based on the foregoing distinction, the **Snodgrass** Court went on to clarify its previous opinion in **Langschmidt v. Langschmidt**, 81 S.W.3d 741, 747 (Tenn. 2002), stating:

At issue[, in **Langschmidt**,] were IRAs that had been funded by the husband prior to his marriage. The wife did not dispute that the premarital contributions to the accounts remained separate property but argued that the investment gains in these IRAs that accrued during the marriage were marital property because the IRAs were retirement benefits. This Court phrased the issue as "whether the increase in value of a spouse's separate [IRA] during the marriage is automatically marital property under Tenn. Code Ann. § 36-4-121(b)(1)(B) when the IRA is funded entirely with premarital earnings." **Langschmidt**, 81 S.W.3d at 742.  We held with respect to that issue that "the appreciation of a spouse's IRA during the marriage is separate property when funded completely with premarital earnings and absent substantial contribution by the other spouse to the preservation and appreciation of the IRA." **Id.**

\*\*\*

The IRAs at issue in **Langschmidt** were not "vested pension, retirement or other fringe benefit rights" within the meaning of (b)(1)(B) because they were not associated with the husband's employment . . . . Rather, the IRAs at issue in **Langschmidt** had been funded by the husband in his individual capacity entirely with premarital funds and prior to his

marriage. The ***Langschmidt*** IRAs were husband's separate property because, first and foremost, they did not fit the definition of marital property set forth in the second clause of (b)(1)(B). By the same token, because the IRAs at issue in that case were not a product of the husband's employment, they did not involve deferred compensation.

***Snodgrass***, 295 S.W.3d at 253-54 (footnote omitted). So, "absent substantial contribution by the other spouse to the preservation and appreciation of the IRA," the pre-marital value of an IRA and any appreciation in the value of that IRA during the marriage remain separate property. Conversely, the ***Snodgrass*** Court explained that

> [t]he right to participate in a 401(k) plan, if exercised, is also capable of accruing value over time beyond the parties' contributions, both through employer contributions and through investment gains. A spouse's 401(k) account therefore fits the (b)(1)(B) definition of marital property as a "retirement or other fringe benefit right[ ] relating to employment." Whether the monies within the account are marital property or separate property depends on when they accrued, not how. ***See Franklin*** [***v. Franklin***, C/A No. 03A01-9410-CV-00364,] 1995 WL 371573, at *2 [(Tenn. Ct. App. June 21, 1995)] (recognizing that, in assessing marital portion of retirement benefits, "[t]he critical determination is whether the value 'accrued' during the marriage").

> \*\*\*

> In summary, then, Tennessee Code Annotated section 36-4-121(b)(2)(C) defines separate property as including "[i]ncome from and appreciation of property owned by a spouse before marriage" but specifically excludes such income and appreciation when it is "characterized as marital property under subdivision (b)(1)." That portion of a 401(k) account existing on the date of marriage remains separate property. Because, however, the account is a "retirement or other fringe benefit right[ ] relating to employment," ***id.*** at (b)(1)(B), the entire net amount of income and appreciation that was experienced in Husband's and Wife's 401(k) accounts during their marriage is characterized as marital property, including that which accrued on the premarital balances. ***See also Langschmidt***, 81 S.W.3d at 749 ("Retirement benefits accrued during the marriage clearly are marital property under Tennessee law.").

***Snodgrass***, 295 S.W.3d at 251.

Viewing the facts of the instant case in light of the Tennessee Supreme Court's holdings in ***Snodgrass***, we conclude that the trial court's application of a percentage-

- 10 -

based division of this asset was error. Here, it is undisputed that, at the time of the marriage, Husband's United 401(k) had a balance of $46,986.42. Under **Snodgrass**, this was his separate property; however, any appreciation or contributions to the 401(k) during the marriage were marital property. During the first year of marriage, i.e., 2006, an additional $72,364.92 was deposited into the United 401(k). No other funds were added to the account during the marriage; however, due to the market, and as found by the trial court, the value of the account rose to $128,204.23 in 2006. Then, in 2008, the account value rose to $146,127.27. As set out above, the trial court included the percentage of growth on Husband's initial $46,986.42 in calculating the portion of the account that was his separate property. This was error. Under **Snodgrass**, Husband is not entitled to the appreciation on the $46,986.42 during the marriage; any increase in value in the 401(k) account after the marriage is marital property. Husband's separate property remains $46,986.42. **Snodgrass**, 295 S.W.3d at 251 ("That portion of a 401(k) account existing on the date of marriage remains separate property. Because, however, the account is a 'retirement or other fringe benefit right[ ] relating to employment,' the entire net amount of income and appreciation [in the] accounts during their marriage is characterized as marital property, including that which accrued on the premarital balances.") (citations omitted).

On or about July 18, 2008, Husband rolled the United 401(k) funds into a new Fidelity IRA. It is undisputed that no other funds, marital or otherwise, were added to the Fidelity IRA at any time. Thus, Husband's separate property, i.e., $46,986.42, remained traceable. **Church v. Church**, M2004-02702-COA-R3-CV, 2006 WL 2168271, at *7 (Tenn. Ct. App. Aug.1, 2006) ("Property acquired prior to a final [divorce] hearing that is traceable to separate property constitutes separate property unless it has been gifted to the marital estate or has been transmuted into marital property through inextricable commingling with marital estates."). Thereafter, the Fidelity IRA decreased in value during the market downturn of 2008. By 2009, the value of the account had fallen to $44,069.95.

As mentioned above, the Ameritrade IRA, which is now the subject of this appeal, was opened by Husband prior to the marriage. It is undisputed that at the time of the marriage, the Ameritrade IRA had a value of $5,973.60. Under **Snodgrass**, this was Husband's separate property. When Husband moved the Fidelity IRA funds into the existing Ameritrade IRA, his separate property was the $46,986.42 pre-marital value of the United 401(k), which remained traceable, plus the $5,973.60 pre-marital value of the Ameritrade IRA. At the time of the hearing, the value of the Ameritrade IRA had grown to $355,757. The question, then, is whether any amount of the $355,757 over what we know to be Husband's separate property, i.e., $52,960.02, is also Husband's separate property. We turn to that question.

The Ameritrade IRA was initially funded with Husband's separate property of $52,960.02 and marital property consisting of amounts that had accrued and been added

- 11 -

to the United 401(k) during the marriage, *see supra*. In this regard, the instant case is distinguishable from the ***Langschmidt*** case, where the Tennessee Supreme Court held that "the appreciation of a spouse's IRA during the marriage is separate property **when funded completely with premarital earnings** and absent substantial contribution by the other spouse to the preservation and appreciation of the IRA." 81 S.W.3d at 742 (emphasis added). Here, the Ameritrade IRA was funded with both marital and separate property. Furthermore, the account enjoyed significant growth during the marriage. Because the growth is attributable both to market factors and to contributions made during the marriage, any amounts over Husband's initial contribution of $52,960.02 are marital property. Accordingly, while we affirm the trial court's finding that this $355,767 asset contains both separate and marital property, we modify the trial court's finding that $196,000 of the asset is Husband's separate property. Based on the foregoing analysis, Husband is entitled to $52,960.02 of the Ameritrade IRA as his separate property. The remaining balance of the account, including any accrual or loss during the pendency of this appeal, is marital property, which the trial court is instructed to divided equitably on remand. Our holding does not preclude the trial court from awarding Husband the additional $15,000 as an offset of the award of the Epsilon account to Wife, nor is the trial court precluded from subtracting, from Husband's separate portion of this account, any monies he withdrew to satisfy his *pendente lite* obligations.

## B. Texas Property

In the final decree of divorce, the trial court divided the Texas Property as follows:

This property was purchased by Husband prior to the marriage and titled solely in the name of Husband. During the marriage, however, the Court finds that there are some marital equities in the property due to the comingling of separate and marital property. Therefore[,] this Court finds that the property is made of mixed marital and separate property.

The Court finds that the fair market value of this property is $575,000 based upon Husband's testimony as well as his pre-trial submissions. The parties agree that there is an outstanding mortgage on the home of $372,000, leaving equity in the home of $203,000. Of this amount of equity, the Court finds that $175,000 is marital property based upon the marital funds used to refinance the home, the renovations of the home, and the marital funds used to pay the mortgage above and beyond the rent that was received from tenants. The remaining $28,000 is Husband's separate property.

Husband is awarded sole title and exclusive ownership of the [Texas Property] as his separate asset. Wife shall be divested of any right, title and interest in and to said property, and the same shall be vested into Husband. Husband shall indemnify and hold Wife harmless from any indebtedness or liability thereon. Husband shall be responsible for paying any and all

indebtedness associated with said real property, and Husband shall be further responsible for payment of all other expenses associated with said property. Wife shall execute a quit claim deed divesting herself of any and all interest in said property.

The Court also finds that the marital portion of this equity is $175,000 and that the remaining equity is Husband's separate property.

On appeal, both parties refute the trial court's characterization and division of the Texas Property. Husband argues that the trial court failed to state the basis for its decision in violation of Tennessee Rule of Civil Procedure 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment."). Thus, he contends that the trial court's ruling on the Texas Property should be vacated and remanded. We disagree. As set out above, the trial court's ruling on the Texas Property contains sufficient findings to indicate its reasoning so as to enable this Court to review the decision. Having so concluded, we turn to the substantive question of whether the trial court erred in classifying the Texas Property as both marital and separate.

At trial, Husband maintained that the Texas Property remained his separate property based on the fact that the property remained titled in his name. At the outset, we note that the fact that the Texas Property was titled in Husband's name alone is not dispositive of the question of whether the property remains Husband's separate property. See *Cohen v. Cohen*, 937 S.W.2d 823, 833 n.12 (Tenn. 1996) ("The fact that no title or other legal interest has been conveyed to the non-owner spouse is irrelevant. For the purposes of property division in a divorce, '[i]n the final analysis, the status of property depends not on the state of its record title, but on the conduct of the parties.'" (citations omitted)). "An asset separately owned by one spouse will be classified as marital property if the parties themselves treated it as marital property." *Fox v. Fox*, No. M2004-02616-COA-R3-CV, 2006 WL 2535407, at *5 (Tenn. Ct. App. Sept. 1, 2006).

Wife argues that the entire Texas Property was transmuted into marital property due to the expenditure of joint funds for the maintenance of the property during the marriage. As very recently explained by this Court:

"[Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property." *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 256 (Tenn. 2009) (quoting *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 747 (Tenn. 2002)). In determining intent, "the ultimate test is how the property was treated by the parties." *Strickland v. Strickland*, No. M2012-00603-COA-R3-CV, 2012 WL 6697296, at *17 (Tenn. Ct. App. Dec. 21, 2012). Factors include (1) the use of the property by the family or to support the marriage; (2) shared control, maintenance, or management of the property; (3) titling the

- 13 -

property jointly; and (4) use of the non-owner spouses' credit or separate funds to pay for or improve the property. ***Luplow v. Luplow***, 450 S.W.3d 105, 114 (Tenn. Ct. App. 2014) (quoting ***Fox***, 2006 WL 2535407, at *3); 2 John Tingley and Nicholas B. Svalina, Marital Property Law § 42:30 (2d ed.); *see also* ***Woodward v. Woodward***, 240 S.W.3d 825, 829 (Tenn. Ct. App. 2007) (use as marital residence); ***McClellan v. McClellan***, 873 S.W.2d 350, 352 (Tenn. Ct. App. 1993) (intent to use as permanent family home); ***Kincaid v. Kincaid***, 912 S.W.2d 140, 142 (Tenn. Ct. App. 1995) (use of marital and non-owner spouse's funds).

***Anderson v. Anderson***, No. M2018-01248-COA-R3-CV, 2019 WL 3854663, at *5 (Tenn. Ct. App. Aug. 16, 2019). As the proponent of transmutation, Wife has the burden of establishing same. ***Nesbitt v. Nesbitt***, No. M2006-02645-COA-R3-CV, 2009 WL 112538, at *9 (Tenn. Ct. App. Jan. 14, 2009).

Turning to the record, at the hearing, Husband conceded that at least $100,000 of marital funds had been used to maintain the Texas Property, to-wit:

> Q. Would you agree with me that there's been substantial marital funds placed in the [Texas Property] to maintain it and pay the mortgages, to do improvements, pay taxes?
>
> A. I agree that there have been substantial funds . . . . I would say more than $100,000.00, which is pretty substantial and that all of those funds came from my efforts and labor, my income.
>
> ***
>
> Q. So it's your testimony that at least . . . $100,000.00 of marital funds went into the [Texas Property]?
>
> A. I would stipulate to $100,000.00, yes.

Concerning income received during the marriage from rent on the Texas Property, Wife entered Trial Exhibit 6, which consists of Wife's Rule 1006 summary of rental income from the Texas Property from 2006 until 2016. Wife's summary indicates that during the marriage, the parties received gross rents of $253,606.84. Wife's summary is corroborated by statements from Remarkable Asset Management, the management company for the Texas Property from 2009 until 2016.

Concerning expenditures for the mortgage, maintenance, and taxes on the Texas Property during the marriage, Wife testified, in relevant part, as follows:

Q. Has the rental income on [the Texas Property] covered the cost of the mortgage?

A. It has not.

Q. Have there been repairs made to this property during the marriage?

A. There have been maintenance repairs as well as significant renovations and upgrades made over the course of the years.

Q. Approximately what sort of price range did that renovation encumber?

A. In 2009 it had been vacant for over a year and part of the problem was it needed to be upgraded. We spent over $20,000.00 in materials and labor as well as I spent almost two months living down there, painting, dealing with contractors and purchasing supplies and doing upgrades myself.

Q. The cost of these renovations and this mortgage, what account were they paid from? Where did that money come from?

A. It came from marital assets . . . . It's paid for out of the joint marital account.

\*\*\*

Q. What w[as] the source of these funds that were used on the [Texas Property]?

A. These were mostly marital funds; some of my premarital assets as well.

Q. And can you tell the Court what the total expenses were from marital funds and your separate funds on [the Texas Property during the marriage]?

A. Sure. $552,812.27

In addition to the foregoing testimony, Wife entered Trial Exhibit 7, which is comprised of her Rule 1006 summary of total expenses for the Texas Property. The summary shows total expenses of $552,812.27 for the years 2006 through October of 2016. Also, as part of Trial Exhibit 7, Wife provided monthly bank statements for the parties' joint checking account. These monthly statements cover the years 2006 through 2016 and corroborate the itemization of expenditures listed in Wife's summary. Wife's testimony and proof concerning the rental income from and expenditures on the Texas Property are not disputed except to the extent that Husband testified, without corroborating proof, that the

- 15 -

parties spent at least $100,000 in marital funds for maintenance of the Texas Property. Based on the evidence, "the strength or weakness of Wife's [transmutation] argument [largely] depends on the amount of joint maintenance and management" of the Texas Property. *Watson v. Watson*, No. E2010-00577-COA-R3-CV, 2010 WL 5549050, *7 (Tenn. Ct. App. Dec. 29, 2010).

In support of her argument that the entire Texas Property was transmuted, through joint maintenance and management, into marital property, Wife relies on this Court's *Anderson* opinion. In *Anderson*, Wife helped make loan payments on the promissory note she signed, and the proceeds from the loan were used in part to refinance the existing mortgage on the real property husband brought to the marriage. 2009 WL 3631029, at *2. The trial and this Court relied on the wife's payments to conclude that the property, which was initially husband's separate property, was ultimately transmuted into marital property:

> Based on the fact that Ms. Anderson signed the note which allowed Mr. Anderson to refinance and improve the . . . property and helped him make the payments, we cannot find that the evidence preponderates against a finding that the Brick Church Pike property became marital property by transmutation.

*Anderson*, 2009 WL 3631029, at *3. *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007) (affirming trial court's finding of transmutation where, "[f]or approximately twenty years, [husband] used marital funds to pay $150 per month to help defray the mortgage expenses. . . . This evidence is sufficient to support the trial court's decision to classify [the] house as marital property."); *Gorbet v. Gorbet*, No. W2011-01879-COA-R3–CV 2012 WL 4847090 (Tenn. Ct. App. Oct. 11, 2012) (finding transmutation where, *inter alia*, "Husband paid the mortgage with funds earned during the marriage").

In the instant case, both parties testified that a substantial amount of marital funds were used to maintain the Texas Property, including the mortgage payments thereon. Husband's uncorroborated testimony that the amount was no more than $100,000 is disputed by Wife's corroborated testimony that the amount expended was closer to $500,000. Despite the disparity in the parties' respective testimony, the trial court's undisputed finding was that the equity in the Texas Property (at the time of the hearing) was $203,000. The amount of equity available leads us to conclude that the expenditure of even $100,000 of marital funds on the Texas Property was sufficient to transmute the entirety into marital property. *See Liner v. Liner*, No. M2010-00582-COA-R3-CV, 2011 WL 1420883, *3 (Tenn. Ct. App. April 13, 2011) (finding transmutation of real property where "[t]he mortgage and utilities for the home were paid out of [a] joint account," and wife made "non-financial contributions to the ongoing maintenance and management of the residence"); *Hagler v. Hagler*, No. E2007-02609-COA-R3-CV, 2009 WL 838163, *3 (Tenn. Ct. App. March 31, 2009) ("In this case, the property was never titled jointly, but

the evidence supports the Trial Court's conclusion that this property should be treated as marital. The evidence demonstrated that . . . wife contributed . . . to the maintenance and improvement of the property. The evidence shows that this property was intended to be part of the marital estate . . . ."); ***Daniel v. Daniel***, No. M2006-01579-COA-R3-CV, 2007 WL 3202778, at *6 (Tenn. Ct. App. Oct. 31, 2007) (finding transmutation where "[t]he mortgage, insurance, and taxes on the [] property were paid with the rental proceeds that had been deposited into a joint bank account held by the parties"). Based on the totality of the circumstance and the foregoing law, we reverse the trial court's characterization of the Texas Property as mixed marital and separate property and remand for an equitable division of the equity and debt thereon as marital property.

## V. Imputation of Income

In its final decree of divorce, the trial court imputed income to both parties for purposes of child support, to-wit:

> 5. The Court imputes to Husband $12,000 per month as gross income for purposes of child support.
> 6. The Court imputes to Wife $2,000 per month as gross income for purposes of child support.

As explained by this Court,

> [t]he Tennessee Child Support Guidelines provide that income may be imputed to a parent when the court determines that the parent is voluntarily underemployed. ***Wadhwani v. White***, No. M2015-01447-COA-R3-CV, 2016 WL 4579192, at *13 (Tenn. Ct. App. Aug. 31, 2016) (citing Tenn. Comp. R. & Regs. 1240-02-04-.04). The guidelines provide factors to be considered when determining whether a parent is willfully and voluntarily underemployed or unemployed. ***Richardson v. Spanos***, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005). The factors include, *inter alia*, the parent's past and present employment; the parent's education, training, and ability to work; the parent's role as stay-at-home parent; and any additional factors deemed relevant to the particular circumstances of the case. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii).
>
> The issue of voluntary underemployment is a question of fact that requires careful consideration of all the attendant circumstances. ***Owensby v. Davis***, No. M2007-01262-COA-R3-JV, 2008 WL 3069777, at *4 (Tenn. Ct. App. July 31, 2008) (citing ***Richardson***, 189 S.W.3d at 726). We afford the trial court considerable discretion in this determination. ***Thayer v. Thayer***, No. M2015-00194-COA-R3-CV, 2016 WL 4056316, at *4 (Tenn. Ct. App. July 26, 2016) (citing ***Willis v. Willis***, 62 S.W.3d 735, 738 (Tenn. Ct. App.

2001)).  "The trial court's decision is entitled to a presumption of correctness, particularly 'when it is premised on the trial court's singular ability to ascertain the credibility of the witnesses.'"  **Id.** (citing **Reed v. Steadham**, No. E2009-00018-COA-R3-CV, 2009 WL 3295123, at *2 (Tenn. Ct. App. Oct. 14, 2009)).

**Ghorashi–Bajestani v. Bajestani**, No. E2016–00063–COA–R3–CV, 2017 WL 809880, at *9 (Tenn. Ct. App. March 1, 2017).  As further explained by this Court:

> When called upon to determine whether a parent is willfully and voluntarily unemployed or underemployed, the courts will consider the factors in Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(d)(2), as well as the reasons for the party's change in employment.  **Demers v. Demers**, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003); **Eldridge v. Eldridge**, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). If a parent's reasons for working in a lower paying job are reasonable and in good faith, the court will not find him or her to be willfully and voluntarily underemployed. **Willis v. Willis**, 62 S.W.3d at 738. The courts are particularly interested in whether a parent's change in employment [or amount of income] is voluntary or involuntary, **Eldridge v. Eldridge**, 137 S.W.3d at 21, and are more inclined to find willful and voluntary underemployment when a decision to accept a lower paying job is voluntary. **Demers v. Demers**, 149 S.W.3d at 69.

**Richardson v. Spanos**, 189 S.W.3d, at 726.  Furthermore,

> [a] determination of willful and/or voluntary underemployment or unemployment is not limited to choices motivated by an intent to avoid or reduce the payment of child support.  The determination may be based on any intentional choice or act that adversely affects a parent's income.

Tenn. Comp. R. & Reg. 1240-2-04-.04(3)(a)(2)(ii).  Accordingly, the touchstones for this inquiry are the reasonableness of the employment decision and whether the choice to take a lower paying job was voluntary, to-wit:

> Our courts will consider the reasonableness of the obligor parent's occupational choices in light of surrounding circumstances.  *See Narus v. Narus*, No. 03A01-9804-CV-00126, 1998 WL 959839 at *2 (Tenn. App. Ct. Dec. 31, 1998) (no Tenn. R. App. P. 11 application filed) (obligor not willfully and voluntarily unemployed or underemployed where obligor chose "to retire at a reasonable age, for legitimate reasons, and otherwise under reasonable circumstances.").  The trial court must consider whether the choice to take a lower paying job is made in good faith and whether some or all of the unrealized earning capacity should be included as

- 18 -

imputed income.

* * *

Generally, where a reduced actual income is involved, the fact patterns differ on whether the leaving of previous employment or other income producing activity was voluntary. . . .

**Ralston v. Ralston**, No. 01A01-9804-CV-00222, 1999 WL 562719, at *3 (Tenn. Ct. App. Aug. 3, 1999).

Concerning whether the parties were willfully and voluntarily unemployed or underemployed, the trial court's final decree of divorce states:

The Court also specifically finds that Husband was released, or engineered his release, from employment that allowed him to be a high-wage earner and its is highly unlikely that Father will be reemployed in his field of loyalty analyst. The Court finds that Father has devised a plan not to find more stable and substantially gainful employment until after the Court establishes and sets alimony and child support and divides the financial assets. The Court also finds that Husband is willfully underemployed.

***

The Court finds that Wife is employable but will not likely attempt gainful employment until after the divorce is final and finances and support have been established by the Court. Wife has a law degree and is licensed in Tennessee and has an LLM in good standing.

Turning to the record, during the early part of the marriage, 2006 to 2014, Husband had solid employment with United Airlines and AutoZone, where he worked as the director of loyalty and analysis. Husband's average salary for the last three years he worked for AutoZone (i.e., 2012-2014) was $208,714 not including stock options. In 2014, Husband took a "buy-out" from AutoZone. After he left AutoZone, Husband was unemployed until the Fall of 2015, when he took a part-time consultant position with Epsilon Consulting. Husband earned $140 per hour at Epsilon. In 2016, he earned $126,800; in 2017, he earned $63,035. Concerning the reduction in his income, Husband explained:

Regarding my hours [at Epsilon], my consulting hours have declined significantly over the last year. I've acknowledged that. My sponsor who brought me on board with that consulting agency himself got canned and

- 19 -

not only did that have a direct result in fewer clients for them . . . [and] no new work for me.  So, yes, my hours did decline, not by my choice.

Husband further admitted that his employment decisions have been influenced by his desire to spend more time with the parties' minor child:

> There was a . . . full-time versus part-time engagement for three months, and I did turn down the full-time engagement for three months in lieu of part-time engagement . . . because I could not  . . . keep my son. . . .

Although we acknowledge Husband's desire to spend time with his son, Husband opined that his decision to take part-time employment has had a negative effect on his job prospects, to-wit:
> With four years of under—of part-time work, I am effectively damaged goods right now.  I have not damaged myself intentionally.  I have not destroyed the career I've spend decades building intentionally . . . .  I have been actively working to identify opportunities from the moment I left AutoZone . . . .

As noted above, "[t]he determination [of voluntary underemployment] may be based on any intentional choice or act that adversely affects a parent's income."  Tenn. Comp. R. & Reg. 1240-2-04-.04(3)(a)(2)(ii).  Here, by his own testimony, Husband made decisions that may have allowed him more time with his child, but which adversely affected his ability to earn income comparable to that he enjoyed during the marriage.  As such, we conclude that the trial court did not err in determining that Husband was voluntarily underemployed for purposes of imputing income to him.  That being said, the question remains whether the amount of income imputed to him was reasonable.

Husband testified that his "average income over the last three years was about $78,000" but acknowledged that "if I could find a full-time position [I] could earn a little bit more."  According to Husband's testimony, he has applied for full-time positions with base salaries between $100,000 and $130,000:

> So the FedEx job was 100 to 120,000 was the stated pay range.  I did make it to the final five in that job, but did not receive the offer . . .  There is another position that I applied for recently.  The target pay on that was 120 to 130.  It was not a local job.  It would have to require moving to Raleigh, North Carolina . . . .  That job was as close a job as I have seen to exactly what I was doing at AutoZone.

As set out above, the trial court imputed income to Husband of $12,000 per month, or $144,000 annually.  Although less than the $208,714 average salary he earned at AutoZone, the trial court specifically found that "it's highly unlikely that [Husband] will

be reemployed in his field of loyalty analyst." Based on the evidence, we agree. Nonetheless, from our review, there is no basis in the record for the trial court's imputation of $144,000. In determining the proper amount of income to impute, a trial court should consider a parent's education, training, and ability to work, as well as past and present employment. Tenn. Comp. R. & Regs. 1240-2-04-.04(3)(a)(2)(iii). The court should impute additional income to an underemployed parent in an amount that reflects that parent's income potential or earning capacity. *Id.*; *Armbrister v. Armbrister*, No. E2010-01561-COA-R3-CV, 2011 WL 5830466, at *6 (Tenn. Ct. App. Nov. 21, 2011). Based on Husband's testimony, and the record as a whole, we conclude that there is an evidentiary basis to support imputation of income to Husband of $120,000 per year, or $10,000 per month. We, therefore, modify the trial court's order to reflect this amount of imputed income.

Concerning Wife, we agree with the trial court's determination that she "is employable." Wife has both a J.D. and an LLM, and she is a licensed attorney. There is nothing in the record to suggest that she has any disability that would preclude her from seeking gainful employment. Accordingly, she is voluntarily unemployed. While acknowledging that Wife has forgone efforts to obtain employment until the divorce is settled, the trial court imputed income of only $24,000, or $2,000 per month, to her. This was error.

Under the Child Support Guidelines, when "[t]he tribunal has no reliable evidence of the parent's income or income potential; [t]hen, in such cases, gross income for the current and prior years shall be determined by imputing annual gross income of . . . twenty-nine thousand three hundred dollars ($29,300) for female parents." Tenn. Comp. R. & Reg.1204.2-4-.04(iv)(1). Here, however, Wife testified, in relevant part, that:

> Q. Do you believe it's possible to make up to $50,000.00 with the [degrees] you have or between thirty and fifty thousand?
> A. I know I was able to get a job for $30,000.00 in Chicago and I imagine ten years later a similar job in Chicago would probably be—I could probably get paid more.

In view of Wife's education, she should be fully capable of earning at least $50,000 per year. Therefore, the trial court's imputation of income to her of less than the minimum wage in this State was error. Based on the record, and Wife's own testimony, we modify the trial court's order to reflect an imputed income to Wife of $50,000 per year, or $4,166.67 per month.

## VI. Parenting Plan and Child Support

In divorce cases involving minor children, "the court may . . . award the care,

custody and control of such ... children to either of the parties to the suit or to both parties in the instance of ... shared parenting ... as the welfare and interest of the ... children may demand," Tenn. Code Ann. § 36-6-101(a)(1). Both the primary residential parent designation and the parenting schedule are driven by the child's best interest. *See id.* §§ 36-6-106(a), -404(b) (requiring custody determination and parenting plan to be in the best interest of child); *Armbrister*, 414 S.W.3d at 693. Courts must fashion a residential schedule "consistent with the child's developmental level and the family's social and economic circumstances, which encourage[s] each parent to maintain a loving, stable, and nurturing relationship with the child." Tenn. Code Ann. § 36-6-404(b). Unless certain limiting factors found in Tennessee Code Annotated § 36-6-406 are "dispositive of the child's residential schedule," which is not the case here, the court determines the schedule on the basis of the child's best interest, relying on a non-exclusive list of factors found at Tennessee Code Annotated § 36-6-106(a). *Id.* The determination of a child's best interest presents a question of fact. *Armbrister*, 414 S.W.3d at 692-93; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, we "presume that a trial court's factual findings on [best interest] are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Armbrister*, 414 S.W.3d at 693.

At the outset of the divorce hearing, Wife's attorney announced that the parties had reached an agreement concerning the parenting plan. The plan largely followed the *pendente lite* schedule and awarded equal parenting time to the parties. Although Husband indicated that the agreed permanent parenting plan may prove to be unrealistic if he has to move from Memphis for employment, at the time of the hearing, his concerns were merely speculative. When presented with the permanent parenting plan, the trial court stated:

> The law says equal parenting schedule, there is a default to the mother as the primary residential parent.[1] That's what the law says. Now, if you all

---

[1] As a point of edification, Tennessee law does not currently favor one parent over the other in terms of primary residential parent. Although Tennessee historically implemented the so-called tender ages doctrine, as explained by this Court:

> This view [i.e., the tender ages doctrine preference for the mother to have custody of minor children] prevailed in Tennessee for decades. *See*, for example, *Parker v. Parker*, 235 SW2d 580 (Tenn. 1951); *Lyle v. Lyle*, 6 SW 878, (1888); *McAllister v. McAllister*, 57 Tenn. 345 (1872); *Robinson v. Robinson*, 26 Tenn. 40 (1846); *Long v. Long*, 488 SW2d 729, (Tenn. App. 1972); *Logan v. Logan*, 176 SW2d 601 (1943). But the law respecting custodial preference gradually edged away from gender considerations concurrently with the enactment of legislation and the development of a body of law dealing with the eradication of discrimination. The trend towards abolition of the doctrine was halted when the Legislature, in 1987, adopted T.C.A. 36-6-101(d) which provides:
>
> > (d) It is the legislative intent that the gender of the party seeking custody

want to put some proof on otherwise, I'll hear that, and that takes into consideration the threshold question: Am I going to approve it otherwise? All right.

On appeal, Husband argues that the "trial court created the reasonable impression that testimony regarding the comparative fitness of the parents would not be necessary." We agree. Although there is some evidence concerning the parties' respective parenting styles and the contentious interactions between them over parenting decisions, the record is not fully developed in regard to whether deviation from the parties' proposed plan would be in the child's best interest. Nonetheless, the trial court found, in its final decree of divorce, as follows:

> 7. The Court recognizes that the parties submitted a Permanent Parenting Plan that was substantially agreed to by the parties. Said Plan provided for week on/week off parenting time for the parties. Having reviewed the proposed Permanent Parenting Plan, however, the Court does not believe that the Plan is in the best interest of the minor child as the Court has concerns about whether the parties can jointly parent the child. The Court concludes that they cannot.
> 8. The Court finds that Wife has been the homemaker and has stayed home to care for the minor child. The Court finds that Husband has consistently been the wage earner, but has turned down job opportunities to maximize his time with the child. While this would be laudable under other circumstances, such as the parties were cordial to each other and money was not an issue, those are not the facts of this case.
> 9. The Court finds that Wife shall be designated as the primary residential parent and that the parenting schedule shall be comprised of 232 days per year for Wife and 133 days per year for Husband.

Tennessee Code Annotated section 36-6-106 (a), to which we refer the trial court,

---

shall not give rise to a presumption of parental fitness or cause a presumption in favor or against the award of custody to such party; provided, however, that in the case of a child of tender years, the gender of the parent may be considered by the court as a factor in determining custody after an examination of the fitness of each party seeking custody.

This enactment acknowledges the ancient rule inherent in the tender years doctrine, but nevertheless parallels the emergent constitutional and civic requirements of neuter-based human relations.

*Gambill v. Gambill*, 1988 WL 97026, *1 (Tenn. Ct. App. Sept. 21, 1988). The current iteration of Tennessee Code Annotated section 36-6-101(d) provides: "It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption or constitute a factor in favor or against the award of custody to such party."

lists fifteen factors, including, but not limited to,

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

\*\*\*

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

\*\*\*

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

\*\*\*

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

As its truncated findings, *supra*, suggest, the trial court's primary reason for deviation from the parties' agreed parenting plan was its "concerns about whether the parties can jointly parent the child." The trial court failed to elaborate on the basis for these concerns before concluding that the parents could not jointly parent. "In bench trials, trial courts must make findings of fact and conclusions of law to support their rulings." *Hardin v. Hardin,* No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *3 (Tenn. Ct. App. Dec. 27, 2012). Tennessee Rule of Civil Procedure 52.01 states, in pertinent part, "In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." "Simply stating the trial court's decision, without more, does not fulfill this mandate." *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *8 (Tenn. Ct. App. Oct. 24, 2012). "[T]he General Assembly's decision to require findings of fact and conclusions of law is 'not a mere technicality.'" *Hardin*, 2012 WL 6727533, at *3 (quoting *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009)). Such "findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision." *Lovlace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013). In the absence of sufficient findings and conclusions, "'this court is left to wonder on what basis the court reached its ultimate decision.'" *In re K.H.*, 2009 WL 1362314, at *8 (quoting *In re M.E.W*., No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)). There is no bright-line test by which to assess the sufficiency of the trial court's findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Lovlace*, 418 S.W.3d at 35 (quoting 9C Federal Practice & Procedure § 2579, at 328). Here, we are left to wonder not only how the trial court reached its determination that the parties could not co-parent, but we are also left to wonder whether the trial court applied the statutory factors in reaching its decision. We concede that the trial court appears to apply statutory factor two in stating that Wife has been the primary caregiver for the child. From the record, this is true; however, it is also true that the parties intentionally arranged their marriage so that Husband would be the primary breadwinner, and Wife would stay at home. In this regard, the trial court failed to consider Husband's contributions to the care and support of the child. Moreover, the trial court again faults Husband for his decision not to seek out-of-town employment so that he can spend more time with the child. While the trial court may certainly consider this choice in its finding that Husband is voluntarily underemployed, the decision may actually weigh in Husband's favor concerning his desire to parent the child. In fact, the trial court seems to suggest just that—"While this [i.e., Husband's decision not to accept out-of-town employment] would be laudable under

other circumstances, such as the parties were cordial to each other and money was not an issue, those are not the facts of this case."

More egregious, however, is the fact that the trial court's order is silent concerning the child's best interest, which is the gravamen of any custody determination and parenting plan. Tenn. Code Ann. §§ 36-6-106(a), -404(b) (requiring custody determination and parenting plan to be in the best interest of child). The absence of any finding concerning the child's best interest is, by itself, reversible error.

In view of the number of statutory factors, *supra*, and the importance of the court's ultimate decision concerning the best interest of the minor child, the trial court's findings are not sufficient either to support its refusal to enter the parties' proposed parenting plan, or to support the parenting plan arrived at by the trial court. Perhaps the trial court's truncated findings are due to the lack of evidence in the record concerning the statutory factors and the child's best interest. Regardless, we vacate the trial court's permanent parenting plan. If, on remand, the trial court declines to enter the parties' agreed plan, then it is instructed to make sufficient findings concerning the child's best interest in view of the statutory factors. To this end, the trial court will likely need to reopen proof to allow the parties to develop a record on this question.

In view of our modification of the parties' respective imputed incomes, *supra*, and our determination that the trial court erred in failing to adopt the parties' parenting agreement absent further findings and/or proof, we vacate the trial court's calculation of child support. On remand, the trial court is instructed to recalculate child support in light of our holdings herein.

## VII. Alimony

Tennessee recognizes four types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1). A court may award rehabilitative alimony, alimony in futuro, transitional alimony, or alimony in solido "or a combination of these, as provided in this subsection (d)." *Id.* However, as the statute expressly provides, the discretion to award "a combination of these [types of alimony]" is subject to "subsection (d)," which states that "[t]ransitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection." Tenn. Code Ann. § 36-5-121(d)(4). As explained by the Tennessee Supreme Court:

> [R]ehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. *See* Tenn.

- 26 -

Code Ann. § 36-5-121(e)(1). *See also **Robertson** [**v. Robertson**]*, 76 S.W.3d [337,] at 340-41 [(Tenn. 2002)]; ***Rigg**s [v. **Riggs**]*, 250 S.W.3d [453,] at 456 n. 4 [(Tenn. 2002)]. Rehabilitative alimony thus serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce. ***Robertson***, 76 S.W.3d at 340-41; ***Isbell v. Isbell***, 816 S.W.2d 735, 738–39 (Tenn.1991). . . .

The fourth category of support, transitional alimony, is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce. Tenn. Code Ann. § 36-5-121(d)(4), (g)(1); ***Riggs***, 250 S.W.3d at 456 n. 5. Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." ***Mills v. Mills***, No. M2009-02474-COA-R3-CV, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010); *see also **Montgomery v. Silberman***, No. M2009-00853-COA-R3-CV, 2009 WL 4113669, at *2 (Tenn. Ct. App. Nov. 24, 2009) (affirming trial court's award of transitional alimony to wife "to bridge the gap, so to speak, between her married life and single life"); ***Engesser v. Engesser***, 42 So.3d 249, 251 (Fla. Dist. Ct. App. 2010) (*en banc*) (describing transitional alimony as "[b]ridge-the-gap alimony" designed to "smooth the transition of a spouse from married to single life"). In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's capacity for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. As such, transitional alimony is a form of short-term support.

***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 108-109 (Tenn. 2011).

Although "[t]here are no hard and fast rules for spousal support decisions," ***Anderton v. Anderton***, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998), in determining whether to award spousal support, the trial court is required to consider "all relevant factors," including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). Although the court must consider all relevant factors, the two most important are the need of the disadvantaged spouse and the obligor spouse's ability to pay. *Gonsewski*, 350 S.W.3d at 110 (Tenn. 2011) (citations omitted).

In reviewing a trial court's award of alimony, we employ the standard set out by the Tennessee Supreme Court in *Gonsewski*:

[A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew* [*v. Burlew*], 40 S.W.3d [465], 470 [ (Tenn. 2001)]; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337

- 28 -

S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010).

*Gonsewski*, 350 S.W.3d at 105 (footnote omitted)

In its final decree of divorce, the trial court considered the statutory factors and made the following findings concerning alimony:

a. **The relative earning capacity, obligations, needs and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources.**
>  The Court finds that both these parties have substantial earning capacity, but Husband historically more so than Wife due to his job history and Wife being an "at-home" mom. The Husband has been the breadwinner, earning salaries and assets and acquiring the bulk of the debt of these parties. The Wife also has need for assistance from Husband based upon the lifestyle they enjoyed while married.

b. **The relative education and training of each party, the ability and opportunity of each party to secure additional education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level.**
>  The Husband has a Master's degree; the Wife has a J.D. and an LLM. Neither has requested any further education, except that Wife will likely have to take continuing legal education classes to bring her legal skills up to speed and to make her competitive in the job market. There are defined limits on either of these parties' ability to earn. Their earning capacity is not limited.

\*\*\*

d. **The age and mental condition of each party.**
>  Husband is fifty-three (53) years old and Wife is forty-seven (47) years old. There was no proof that either party had any mental health condition, although Husband testified that Wife was depressed and suicidal. The Court makes no use of this unsubstantiated lay medical testimony. The Court finds that there is insufficient proof to do more than note this testimony.

\*\*\*

f. **The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage.**

> The parties have a minor child who is ten (10) years old and requires adult supervision. The Wife has traditionally and historically not worked outside the home. No argument was put forth that the child no longer needed or required the full attention of an unemployed parent. While the Husband testified that he has encouraged Wife to work, he, in accordance with his religious faith, accepted her role in the home as homemaker and he has been the provider for this family.

g. **The separate assets of each party, both real and person[al], tangible and intangible.**

> The Court makes reference to the separate property that has been awarded to each of these parties, the assets that have been divided, both real and personal, and the amount and value of the liquid assets that each of these parties have been awarded . . . .

*** 

i. **The standard of living of the parties established during the marriage.**

> The Court finds that the parties established a standard of living during the marriage that allowed them to own real property by way of residences both in Tennessee and Texas, to travel rather extensively, and purchase as they desired. They were able to do all this while living within their means. Only the Husband worked and, after he lost his full time position in 2014, the parties began liquidating assets to meet their expenses. The problem is that this standard can no longer be maintained as the parties are currently situated.

j. **The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions intangible and tangible contributions by a party to the education, training or increased earning power of the other party.**

> Husband worked and provided financially for the family and Wife was a dutiful wife and homemaker. Both parties contributed financially to the marriage. Husband contributed through his employment. Wife contributed as a homemaker and caretaker of the parties' child. In addition, Wife

contributed some of her separate savings to pay marital expenses as well as the down payment on the marital residence. Wife also earned her JD and LLM, in 2008, during the course of the marriage.

k. **The relative fault of the parties, in cases where the Court, in its discretion, deems it appropriate to do so.**
The Court finds that each of the parties [was] at fault for the breakdown of the marriage with the underlying factor being that neither party is willing to compromise.

l. **Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.**
The Court finds that Wife is the economically disadvantaged spouse and that she has demonstrated a need for alimony. Wife has been a stay at home mom and Husband has the greater earning capacity at this point. Husband has the ability to pay alimony to Wife.

Based on the foregoing findings, the trial court awarded Wife alimony as follows:

17. Rehabilitative alimony is favored in Tennessee, and is suitable for the facts of this case. While there has been no indication that Wife intends to seek additional education and/or training for a job or position, the testimony was that she needed to gain experience and will likely need to take CLE classes to become comfortable with the law. The Court finds that one year of rehabilitative alimony at a rate of $500 per month should be sufficient for Wife to be rehabilitated in accordance with her skills and training. . . .

18. Transitional alimony is appropriate when the economically disadvantaged spouse needs assistance due to the economic consequences of divorce. Its intent is to enable the economically disadvantaged spouse to adjust to the economic consequences of divorce. The Court finds that it is appropriate to award Wife transitional alimony in this case as she needs assistance transitioning from a stay at home mom to the workforce, all while she serves as care taker for the parties' child. The child is ten (10) and needs to be taught independence while he adjusts to the shared parenting arrangement. Wife shall have three (3) years in which to transition into the workforce, taking into consideration that the child will be older and she will have taken the appropriate CLE classes and started her

- 31 -

journey back into the workforce.

19.   Accordingly, the Court awards transitional alimony to Wife in the amount of $2,000 per month for a period of thirty-six (36) months. . . .

***

21.  The Court finds that Wife has incurred attorney fees and litigation costs in this case in excess of $25,000.  The Court finds that Husband shall be responsible for $25,000.00 of Wife's attorney's fees and litigation expenses which is awarded as alimony *in solido* . . . .

In the first instance, the trial court's award of both rehabilitative and transitional alimony in this case was error.  Clearly, Wife does not need to be rehabilitated.  She has a J.D., an L.L.M., and a Tennessee law license.  Although, as the trial court finds, "Wife will likely have to take continuing legal education classes to bring her legal skills up to speed and to make her competitive in the job market," continuing legal education is a requirement for most attorneys in this State.  If she chooses law, Wife will be continually learning throughout her career.   Accordingly, Wife is not in need of rehabilitation, and the trial court's award of rehabilitative alimony is reversed.

Because Wife has not practiced law since receiving her degree, we concede that she will require a certain amount of reeducation; however, given her current level of education, she should be able to achieve this goal in relatively short order.  To that end, we conclude that the trial court's award of transitional alimony and the duration of same was correct.  However, in view of our previous holding concerning the parties' imputed incomes and the classification of certain marital property, we vacate the amount of transitional alimony and remand for recalculation of same.

As to the award of alimony in solido, due to Wife's current lack of employment, her need for transition, and in view of the equities between the parties, we affirm the trial court's award of alimony in solido in the amount of $25,000.

## VIII. Attorney's Fees on Appeal

Wife seeks her appellate attorney's fees under Tennessee Code Annotated section 36-5-103(c), which provides:

The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any

suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.[2]

In *Malkin v. Malkin*, 475 S.W.3d 252, 263-64 (Tenn. Ct. App. 2015), this Court explained:

> Tennessee Code Annotated section 36-5-103(c) provides for awards of "reasonable attorney fees incurred in enforcing any decree for alimony," in the discretion of the court. Pursuant to this statute, a court may award attorney's fees to an alimony recipient who is forced to defend an action to reduce or terminate that alimony. *Henderson v. Henderson*, No. M2013-01879-COA-R3-CV, 2014 WL 4725155, at *12 (Tenn. Ct. App. Sept. 23, 2014) (citing *Evans v. Evans*, M2002-02947-COA-R3-CV, 2004 WL 1882586, at *13-14 (Tenn. Ct. App. Aug. 23, 2004)); *see also Owens v. Owens*, No. M2012-01186-COA-R3-CV, 2013 WL 3964793, at *6 (Tenn. Ct. App. July 30, 2013), *perm. app. denied* (Tenn. Nov. 13, 2013) ("Reasonable fees may be awarded pursuant to § 36-5-103(c) in actions to enforce a decree for alimony, which has been interpreted as including the situation where an alimony recipient is forced to defend an action to reduce or terminate that alimony."). The statute authorizes awards of attorney's fees incurred at trial as well as on appeal. *Henderson*, 2014 WL 4725155, at *12. The decision of whether to award attorney's fees incurred on appeal is a matter within the discretion of this Court. *Yattoni–Prestwood v. Prestwood*, 397 S.W.3d 583, 597 (Tenn. Ct. App. 2012) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995); *Seaton v. Seaton*, 516 S.W.2d 91, 93 (Tenn. 1974)).

Simply put, this statute "authorizes courts to award reasonable attorney's fees to the prevailing party in an action to enforce any decree for alimony, child support, or child custody." *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017).

"Appellate courts have discretionary authority to award a spouse 'reasonable attorney fees incurred in enforcing any decree for alimony' regardless of whether the fees are incurred at the original divorce hearing or at any subsequent hearing." *Moon v. Moon*, No. E2015-01470-COA-R3-CV, 2016 WL 1605511, at *8 (Tenn. Ct. App. Apr. 21, 2016) (quoting Tenn. Code Ann. § 36-5-103(c)); *see, e.g., Parker v. Parker*, No. E2018-00643-COA-R3-CV, 2019 WL 1531667, at *6 (Tenn. Ct. App. Apr. 9, 2019)

---

[2] The statute was amended effective July 1, 2018, but the amended version only applies "to actions commenced on or after that date." 2018 Pub. Acts, c. 905, § 1.

(considering an appeal from a divorce trial and awarding the wife attorney's fees because she "should not be required to use her limited resources to pay for the defense of the trial court's award to her of . . . long-term spousal support"); *Henderson*, 2014 WL 4725155, at \*12 (awarding the wife attorney's fees she incurred on appeal from a divorce proceeding when defending against the husband's attempt to reduce or terminate his alimony obligation).

In light of the issues involved in this litigation, the respective financial positions of the parties, and the resolution of the parties' respective appellate issues, we exercise our discretion to deny Wife's request for an award of her reasonable appellate attorney's fees and expenses on appeal.

### IX. Conclusion

For the foregoing reasons, we: (1) affirm the trial court's characterization of the Ameritrade IRA as both marital and separate property; (2) modify the trial court's calculation of the portion of the Ameritrade IRA comprising Husband's separate property to $52,960.02; (3) remand for the remaining balance on the Ameritrade IRA account, including any accrual or loss during the pendency of this appeal, to be equitably divided as marital property; (4) reverse the trial court's holding that the Texas Property is part Husband's separate property and remand for an equitable division of same as marital property; (5) affirm the imputation of income to the parties as modified herein; (6) vacate the parenting plan and remand for sufficient findings justifying the trial court's deviation from the parties' agreed plan and/or for further proof; (7) reverse the amount of child support based on our modification of imputed income and remand for re-calculation of child support in view of our modification and/or in view of any changes to the parenting plan; (8) reverse the award of rehabilitative alimony; (9) affirm the award of transitional alimony and the duration of same; (10) vacate the amount of transitional alimony awarded based on the modification of imputed income and division of property and remand for re-calculation of same; (11) affirm the award of alimony *in solido*; (12) deny Wife's request for attorney's fees on appeal. The trial court's order is otherwise affirmed, and the case is remanded for the foregoing purposes and for further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to the Appellant, John Andrew Wright, and one-half to the Appellee, Belinda Bentley Wright, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE